IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| BRANDY YARNELL, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:22-cv-03123-RK |
| | ) | |
| MERCY CLINIC SPRINGFIELD COMMUNITIES, | ) ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This case involves a single employment retaliation claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Plaintiff Brandy Yarnell alleges in her Complaint that "Defendant terminated Plaintiff's employment in retaliation for Plaintiff's complaints of sexual harassment and discrimination, and for her complaints of retaliation." (Doc. 1.) Before the Court is Defendant Mercy Clinic Springfield Communities' motion for summary judgment. (Doc. 26.) The motion is fully briefed. (Docs. 27, 30, 32.) For the reasons below, Defendant's motion is **GRANTED**.

## Background[1]

### 1. Plaintiff's Position

Plaintiff, who is female, worked for the Defendant from March 2017 until February 2021. Plaintiff began working for Defendant in March 2017 as a Family Nurse Practitioner in a clinic located in Bolivar, Missouri. Plaintiff provided convenient care services, meaning urgent care services with primary care included, in what Plaintiff characterized as "a smaller clinic."

On October 7, 2019, the clinic moved into "a specialty clinic" and the practices were separated into Bolivar Urgent Care and Bolivar Primary Care, with primary care services in one hall and urgent care services in another. On October 7, 2019, Dr. Greg Link joined the specialty clinic as the primary physician and medical director for Bolivar Urgent Care and Bolivar Primary

---

[1] The Court has omitted (1) assertions that are immaterial to the resolution of the pending motion, (2) assertions that are not properly supported by admissible evidence, (3) controverted facts, (4) legal conclusions, and (5) argument presented as an assertion of fact.

Care. Upon moving to the specialty clinic, Kama Deschane was Plaintiff's supervisor and Dr. Link became Plaintiff's collaborating physician.

In April 2020, Corrie Akin, a female, was hired by Jeanette Russell, Director of Operations, as the Manager of Bolivar Urgent Care and Bolivar Primary Care. At that point, Ms. Akin became Plaintiff's supervisor.[2] As Director of Operations, Ms. Russell also became Ms. Akin's supervisor. When Ms. Akin was hired in April 2020, Ms. Russell advised Ms. Akin of concerns regarding Plaintiff's attendance, including Plaintiff leaving early, calling in, and trying to get out of scheduled shifts around holidays and weekends. Ms. Russell remained Ms. Akin's supervisor until June 2020, when Brian Phillips became Director of Operations. Ms. Akin began reporting to Mr. Phillips at that time.[3]

As a nurse practitioner, Plaintiff provided urgent care services for Bolivar Urgent Care, and on each Tuesday, she provided primary care services for Bolivar Primary Care alongside Dr. Link. Urgent care hours were typically 8 a.m. to 7 p.m. each day of the week, including holidays, with shorter hours on Sunday. During urgent care hours, the specialty clinic was typically staffed by only one Family Nurse Practitioner. In May 2020, another Family Nurse Practitioner, Billie Scott, joined the specialty clinic to provide urgent care services. Plaintiff and the other Family Nurse Practitioner rotated weekend and holiday shifts so that Plaintiff worked every other weekend and then up to forty hours in a work week, with rotating holidays. The work schedule for the Family Nurse Practitioners was set in advance by the supervisor one month at a time and emailed to them.

**2.     Plaintiff's Attire on July 5, 2020**

On July 5, 2020, Plaintiff worked a shift that ended at 7:00 p.m. (Docs. 27-1, p. 24; 27-15, p. 11; 27-2, p. 3.) While on duty, but shortly before the end of her shift, Plaintiff changed out of her work attire. Plaintiff changed into a tank top and shorts while in the clinic because she was going to exercise after her shift. Plaintiff claims that Ms. Akin subjected her to "sexual harassment" by making a comment about her "booty" and the shorts Plaintiff was wearing in the office. Plaintiff claims, "[Ms. Akin] screamed that I cannot wear booty shorts when I was leaving

---

[2] Dr. Link was the ultimate decisionmaker as to whether Plaintiff's provision of patient care was appropriate. When concerns were raised about Plaintiff from staff and patients, which Plaintiff disputes, Dr. Link and Ms. Akin discussed them.

[3] As Director of Operations, Mr. Phillips had direct contact with Plaintiff, and he was able to observe whether she was satisfactorily performing her job.

work." Plaintiff also said, "[Ms. Akin] said, [y]ou cannot be wearing those booty shorts in here. They show your booty." (Doc. 27-1, p. 20.) Ms. Akin says she told Plaintiff, "it is inappropriate to wear [] short gym shorts while still on the clock."

Defendant's anti-harassment policy instructs employees who believe they have experienced harassment to "immediately seek assistance" and "report it immediately" to the Human Resources department (HR). (Doc. 30-1, p. 2, 3.) Plaintiff did not immediately report Ms. Akin's comments to HR. Rather, it was not until after Ms. Akin addressed performance concerns with Plaintiff on July 17, 2020, that Plaintiff made her first, and only, sexual harassment complaint against Ms. Akin. (Docs. 1, p.1; 1-2, p. 1; 27-15, p. 11, 17-18; 27-2, p. 3.) It is undisputed that Plaintiff made her first sexual harassment complaint against Ms. Akin on July 17, 2020, after Plaintiff had been disciplined by Ms. Akin earlier that same day. (Doc. 30, ¶ 32.)

3. **Plaintiff disciplined on July 17, 2020**

On July 17, 2020, Ms. Akin spoke to Plaintiff about performance concerns. At the meeting, Ms. Akin issued Plaintiff a report entitled "Corrective Action Form." (Doc. 27-2.) The form described the corrective action as a "Performance Coaching Moment" and described the reason for the coaching to be "Poor Patient Care/Unprofessional Behavior." The July 17, 2020 report included the following concerns:

    (a) coming in late;
    (b) leaving before the clinic closes;
    (c) leaving personal belongings in the staff bathroom;
    (d) failing to deliver patient results in a timely manner;
    (e) failing to respond to messages in a timely manner.

According to Ms. Akin's written narrative of the discussion, Plaintiff "stormed out" of the meeting when Ms. Akin brought up the July 5, 2020 incident. The narrative reflects that Ms. Akin commented to Plaintiff that on "July 5th . . . [Plaintiff] was in her workout shorts and tank top not dressed appropriately at 6:45 pm and loading her Jeep . . . and that she needed to stay in Mercy appropriate clothing until 7 when we are closed." The narrative claims that at that point, Plaintiff yelled at Ms. Akin as Plaintiff "stormed out," calling Ms. Akin a "liar" and claiming that Plaintiff "was getting a new job because she is sick of [Ms. Akin]." (Doc. 27-2, p.3)

4. **Plaintiff's Contact with Human Resources on July 17, 2020**

After the July 17, 2020 meeting between Plaintiff and Ms. Akin, but on that same day, Plaintiff made a sexual harassment complaint against Ms. Akin to human resources. Plaintiff

complained that Ms. Akin subjected her to "sexual harassment" by making a comment about her "booty" and the shorts Plaintiff was wearing in the office. Human resources investigated Plaintiff's sexual harassment complaint and spoke to Ms. Akin. During the investigation, Ms. Akin denied that she used the words "booty shorts" and stated that she told Plaintiff "it was inappropriate [for Plaintiff] to wear her short gym shorts while still on the clock." According to Plaintiff, Ms. Akin later apologized to her for making the comment.

5. **Continued Discipline of Plaintiff**

    a. **Corrective Action Form – September 8, 2020**

On September 8, 2020, Plaintiff was issued a Corrective Action Form by Mr. Phillips[4], which Plaintiff signed, regarding her arriving late to work the preceding day, September 7, 2020. (Doc. 27-3.) The form described the corrective action as a "Written Warning."

On September 7, 2020 (Labor Day), Plaintiff was the clinic's only scheduled healthcare provider. Although Plaintiff was to begin seeing patients by 8 a.m., she called a medical assistant around 8:19 a.m. and stated she would not be in until 9 a.m.; Plaintiff did not notify her supervisor until 9:05 a.m., and did not arrive at the clinic until 9:22 a.m.

On September 8, 2020, Mr. Phillips gave Plaintiff a "Written Warning" (Corrective Action Form) for arriving to work almost one-and-a-half hours after her shift started, causing patients to not be seen or treated as she was the only scheduled provider that day. Plaintiff claimed she was late because she had suffered a head injury after a slip and fall on a boat the day before, requiring that she take something to help her sleep.

Mr. Phillips also reported Plaintiff's September 7 actions to human resources in an email, as follows:

> Yesterday 9/7/20 we had a Nurse Practitioner Brandy Yarnell #320135 that failed to show up on time for her shift yesterday. She works Urgent Care in Bolivar and was supposed to start at 8a. She didn't show up until 9:30a and didn't call her leader until 9:05A. We couldn't allow patients into the building due to not having a provider available. She also took the time to message the MA that was on staff that day around 830a to notify them that she wasn't going to be there on time but didn't notify the leader. I am assuming she was hoping the MA wasn't going to notify the leader and no one would ever know. Her reasoning for being late was that she hit her head on a boat the day before and she took something to help her sleep. I plan to address this today while I am here as the Director supporting the manager.

---

[4] On September 8, 2020, Brian Phillips was the Director of Operations and Ms. Akin's supervisor.

### b. Corrective Action Form – October 27, 2020

On October 27, 2020, Plaintiff was issued a Corrective Action Form, which Plaintiff signed, regarding her arriving late to work on October 21, 2020. (Doc. 27-5.) The form described the corrective action as a "Final Warning."

On October 21, 2020, a coworker called Mr. Phillips stating that Plaintiff again did not show up for her scheduled shift, and Mr. Phillips had to call Plaintiff as a result. On October 22, 2020, Mr. Phillips sent an email to human resources stating:

> . . . yesterday 10-21-20 Brandy Yarnell didn't show up to her shift on time. According to her she didn't realize she was on the schedule. Coworker called me at 8:30a advising me that she was not here, I called [Plaintiff] right after that conversation and told her that we had her down for work today. She stated she didn't know that she was on the schedule and got a bit frustrated. She tried to explain that she needs to know when the schedule changes so she can be at work on time. I told her that everyone should have been aware of the changes and that it is her responsibility to be checking the schedule. She got to work at 10am with 4 patients waiting to be seen. The coworker reports her "fixing her hair" before going to see patients. She realized she did have communications of all the changes to the schedule which came out at the beginning of this month. She has already been written up for not showing up for her shift on time. What is our next step?

On October 27, 2020, Plaintiff met with Mr. Phillips, Ms. Akin, and Dr. Link. Plaintiff was given a "Final Warning" (Corrective Action Form) stating it was for arriving at the clinic on October 21, 2020, two hours after the start of her scheduled shift.

On October 28, 2020, Mr. Phillips sent an email to human resources summarizing the October 27, 2020 meeting with Plaintiff, stating, "As you know we met with [Plaintiff] yesterday . . . Our thoughts are to put her on a PIP [performance improvement plan] for 90 days. She must show that she is invested, responsible, and that she is a team player."

### c. Performance Improvement Plan (PIP) Form – October 29, 2020

On October 29, 2020, Plaintiff met with Mr. Phillips, Ms. Akin, and Dr. Link, and was issued a PIP Form, which Plaintiff signed. Plaintiff was told that she was being placed on a PIP for 90 days. The PIP form set forth written expectations for Plaintiff to meet.

The PIP provided, in part:

(a) [Plaintiff] will show up for her schedule shifts on time and stay until her shift ends.
(b) [Plaintiff] will be a team player and care for all patients that present to the UC appropriately even if completing patient care means staying after scheduled shift is over.

5

(c) [Plaintiff] will communicate any barrier or concerns to her manager and Dr. Link. She will lead by example, treat all co-workers with respect, dignity, and will function as a reliable team member.

(d) [Plaintiff] will address all phone calls, prescription refills, my mercy patient requests, lab results and other patient needs in a timely manner. She will also help her other providers that work UC by checking and working their in-basket while she is at work and they are off.

### d. Corrective Action Form – November 30, 2020

On November 30, 2020, Plaintiff was issued a Corrective Action Form, which Plaintiff signed, regarding her poor work performance. (Doc. 27-9.) The form, like the one previously issued on October 27, 2020, described the corrective action as a "Final Warning." Dr. Link, Mr. Phillips, and Ms. Akin, attended the November 30, 2020 meeting with Plaintiff. Plaintiff recorded the November 30, 2020 meeting and agreed that having Dr. Link present and leading the meeting and discussion, as her collaborating physician, on a final warning, meant that "it was a very serious discussion." The Corrective Action Form indicates that in the meeting, Plaintiff was spoken to about not timely responding to messages in her in-basket; not timely responding to patient calls regarding their lab and x-ray results; not timely responding to patient requests for medication refills; failing to interpret x-rays and lab results in a manner that patients are able to understand; and missing work because of her reports of having covid symptoms around a holiday[5] which "looks very suspicious[.]" (Doc. 27-9, p. 1.)

### e. Corrective Action Form – December 29, 2020

On December 29, 2020, Plaintiff was issued a Corrective Action Form regarding Plaintiff's lack of documentation in patient charts, giving previous rather than current lab results, failing to ensure patients receive point of care results, and team concerns regarding communication.

---

[5] Regarding Memorial Day 2020, Plaintiff was to work May 23 and 24, 2020, the Saturday and Sunday before Memorial Day; she took a covid test on Friday, May 22, 2020, which was negative, but did not report to work on Saturday or Sunday, and pictures were posted of Plaintiff on a boat that Friday evening on Stockton Lake. Regarding Thanksgiving 2020, when Plaintiff did not report to work due to covid symptoms, a coworker who worked the weekend Plaintiff was to have worked complained to Ms. Akin about Plaintiff's absence and behavior by sending Ms. Akin a screenshot of Plaintiff at a family event.

6

### f. Resignation Meeting – December 29, 2020

On January 26, 2021, Plaintiff attended a meeting with Dr. Link, Mr. Phillips, and Ms. Akin, along with a human resources representative, which she also recorded. During the meeting, disciplinary concerns and performance issues were discussed with her, including:

(a) Mr. Phillips telling Plaintiff that he had to call her when her patient's chart was missing documentation, which Plaintiff admitted;

(b) Mr. Phillips telling Plaintiff that she failed to document what was said, who she talked to, or what medication she was recommending regarding the patient with congestive heart failure, to which Plaintiff admitted she did forget to document the Z-Pak;

(c) Dr. Link telling Plaintiff that he had to see the patient with congestive heart failure himself as he could not tell what was going on from Plaintiff's notes, which Plaintiff admitted occurred;

(d) Dr. Link telling Plaintiff he had to see the patient with congestive heart failure himself as the patient was in full heart failure, which Plaintiff admitted occurred;

(e) Dr. Link telling Plaintiff that because the patient with congestive heart failure was twenty pounds heavier, that the patient needed a diuretic not a Z-Pak, which Plaintiff admitted occurred;

(f) Dr. Link telling Plaintiff that he took the call from the emergency room physician regarding the patient she sent for the BAM infusion and that the ER physician was "angry" about Plaintiff's actions, "jumping down" Dr. Link's case which he described as "a mess," which Plaintiff admitted occurred; and

(g) Dr. Link telling Plaintiff that she continued to have charts open that should have been closed (to which Plaintiff admitted she wished she had not gotten behind), and telling her when on a PIP one should have matters tip-top.

At the end of the January 26, 2021 meeting, Mr. Phillips told Plaintiff she could resign in lieu of discharge if she opted to complete her outstanding charting, to which she agreed.

On January 26, 2021, when she agreed to resign rather than being discharged, Plaintiff had 63 open charts she was to close from home via remote access, within two weeks; she did not close 10 of the charts. Because Plaintiff opted to resign in lieu of discharge, she was not issued a written termination corrective action form. Plaintiff provided no patient care after January 26, 2021. Plaintiff was paid wages through February 6, 2021, in addition to her accrued paid time off.

### 6. Plaintiff's Charge of Discrimination and Retaliation

On February 25, 2021, Plaintiff filed a Charge of Discrimination with the Missouri Commission on Human Rights and the Equal Employment Opportunity Commission alleging sex

7

discrimination and retaliation. On February 27, 2022, the EEOC issued Plaintiff a Notice of Right to Sue.

Plaintiff filed her Complaint against Defendant in this Court on May 9, 2022. (Doc. 1.) Plaintiff claims Defendant violated Title VII's prohibition against retaliation. Plaintiff's retaliation claim is based on her allegations (1) that Ms. Akin discriminated against her because of her sex and made unwanted comments of a sexual nature regarding her clothing and appearance, (2) that Plaintiff complained to Defendant about that discrimination, (3) that Defendant gave Plaintiff Corrective Action forms "[o]n or about September 9, 2020," on November 30, 2020, and on December 29, 2020, in retaliation for Plaintiff's complaint about that discrimination, and (4) that Defendant terminated Plaintiff's employment on January 26, 2021, in retaliation for Plaintiff's complaints about sexual harassment and discrimination, and for her complaints of retaliation.

**Legal Standard**

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted). "If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, summary judgment should be granted." *Smith-Bunge v. Wis. Cent., Ltd.*, 946 F.3d 420, 424 (8th Cir. 2019) (citation omitted).

At the summary judgment stage, the movant must "support" its motion either by "citing to particular parts of materials in the record" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); Rule 56(c)(1).

In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Rule 56(c); *see also Thomas v. Corwin,* 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment). An "adverse party may not rely merely on allegations or denials, but must set out specific facts – by affidavits or other evidence – showing [a] genuine issue for trial." *Tweeton v. Frandrup*, 287 F. App'x 541,

541 (8th Cir. 2008) (citing Rule 56(e)). In so doing, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted). To controvert a factual position, the nonmoving party must "refer specifically to those portions of the record upon which [he] relies." *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 990 (8th Cir. 2006) (citation omitted).

## Discussion

Title VII makes it unlawful to retaliate against an employee that has opposed any practice made an unlawful employment practice by Title VII. 42 U.S.C.A. § 2000e-3(a). To prove a retaliation claim, a plaintiff must show:

(1) that he or she engaged in statutorily protected activity;

(2) an adverse employment action was taken against him or her; and

(3) a causal connection exists between the two events.

*Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734, 739 (8th Cir. 2005).

Defendant argues that Plaintiff's claim of retaliation fails both element one and element three, thereby mandating entry of summary judgment in Defendant's favor.

### 1. Protected Activity (Element One)

Complaining to your employer of comments that violate Title VII's prohibition against sexual harassment is a statutorily protected activity. However, an employee does not engage in protected conduct by complaining of comments that "[n]o reasonable person could have believed . . . violated Title VII's" prohibition against sexual harassment. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 269-71 (2001). "An individual making a complaint must have an objectively reasonable belief that an actionable Title VII violation has occurred for the complaint to qualify as a protected activity." *Gibson v. Concrete Equip. Co.*, 960 F.3d 1057, 1064 (8th Cir. 2020).

Plaintiff alleges that she engaged in statutorily protected activity when on July 17, 2020, Plaintiff complained to human resources that Ms. Akin subjected her to "sexual harassment" by making a comment about her "booty" and the shorts Plaintiff was wearing in the office. Plaintiff contends that even if Ms. Akin's comments about Plaintiff's "booty" and shorts do not actually violate Title VII's prohibition against sexual harassment, Plaintiff had a reasonable, good-faith belief that Akin's comments did constitute unlawful harassment. Plaintiff argues that she meets this element because her employer's internal policies support the notion that Ms. Akin's comments

9

amounted to sexual harassment, and so she had a reasonable belief the comments also violated Title VII. The Court is not persuaded by this argument.

Defendant contends no reasonable person could have believed that the single incident of Ms. Akin making comments about Plaintiff's "booty" and Plaintiff's shorts violated Title VII's prohibition against sexual harassment. The Court agrees.

The "reasonableness assessment is made in light of the applicable substantive law"—not in light of an employer's internal policies. *Gibson*, 960 F.3d at 1064-65. The applicable law has made it clear "that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Breeden*, 532 U.S. at 271 (holding "no reasonable person could have believed that the single incident [(reading aloud a comment found in an applicant's file that 'I hear making love to you is like making love to the Grand Canyon')] violated Title VII's standard.") (citation and internal quotation marks omitted). "For a retaliation claim, although the action opposed is not required to be unlawful, the foregoing standard[] assist[s] the Court in determining whether plaintiff had a good faith, objectively reasonable belief that the conduct was unlawful." *Shirrell v. Saint Francis Med. Ctr.*, 24 F. Supp. 3d 851, 863 (E.D. Mo. 2014). The Eastern District set out the standard in *Shirrell* as follows:

> In *Brannum v. Missouri Dept. of Corrections*, [518 F.3d 542 (8th Cir. 2008),] the Court found that a single, relatively tame comment was insufficient as a matter of law to support an objectively reasonable belief of unlawful sexual harassment. As a result, the Court held that the plaintiff did not engage in protected activity as required to establish a prima facie case of retaliation and affirmed the district court's grant of summary judgment in favor of the employer on plaintiff's Title VII retaliation claim..

*Id.* (citations omitted).

Here, at best, the only alleged instance of sexual harassment that Plaintiff reported to human resources is an isolated comment about Plaintiff wearing "booty shorts." In light of the applicable law as stated above, no reasonable person would believe this single comment alone violates Title VII, and therefore Plaintiff's complaint does not qualify as a protected activity for purposes of her Title VII retaliation claim.

### 2. Causation (Element Three)

The standard of causation for a retaliation claim "requires the plaintiff to show that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Univ.*

of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346-47 (2013) (citations and quotation marks omitted). In other words, "the plaintiff must show that the protected conduct was a 'determinative – not merely motivating – factor' in the employer's adverse employment decision." *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1148 (8th Cir. 2008) (citations and quotation marks omitted).

Here, Plaintiff failed to show a genuine dispute as to whether "the desire to retaliate was the but-for cause" of the asserted adverse employment action. *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013). "Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation. And post-hoc complaints d[o] not without more raise a retaliation bar to the proposed discipline." *Carrington v. City of Des Moines*, 481 F.3d 1046, 1051 (8th Cir. 2007) (internal quotation marks omitted). *See also Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008) (finding problems that arose before protected activity and additional disciplinary measures based on insubordination did not support a retaliation claim).

The record of undisputed facts shows that Defendant issued Plaintiff a "Corrective Action Form" on July 17, 2020, to address Plaintiff's "poor patient care" and "unprofessional behavior" before Plaintiff lodged her one sexual harassment complaint with HR (or human resources). Progressive disciplinary actions for documented issues continued after Plaintiff made her complaint. Plaintiff fails set forth any specific facts beyond her initial complaint to human resources to show Defendant's desire to retaliate for that complaint was the but-for cause of her termination. Without more, Plaintiff has not raised a genuine issue of material fact as to causation, a requisite element of her initial prima facie Title VII retaliation case.

**Conclusion**

Because Plaintiff has not set forth specific facts showing that a genuine issue of material fact exists as to her claim of retaliation in violation of Title VII, Defendant's motion for summary judgment is **GRANTED**.

                                                        s/ Roseann A. Ketchmark
                                                        ROSEANN A. KETCHMARK, JUDGE
                                                        UNITED STATES DISTRICT COURT

DATED: October 30, 2023